The last case on this morning's docket, introduced this morning still, is a case of Tomlinson v. Paris Community Hospital et al. and we have, let's see, we have Cherry Stewart, even sometimes when you print I have trouble, and Mark, for the appellant, and Mark Strands are the appellates, and you may, oh, I'm sorry, we also have, no, Mark Standa. Okay, thank you. Standa, I'm sorry. Thank you, and you may begin, Mr. Stewart. May it please the court? Counsel? This is Hospital and Medical Foundation of Paris Incorporated doing business with Paris Community Hospital's appeal from the circuit court's finding of friendly contempt. The court had ordered production of documents from the hospital's credential file for Dr. Lawson and portions of two letters dated April 29, 2009 and October 15, 2008 relating to the hospital's emergency medical services committee that the hospital claims are privileged. I just wanted to start out by saying there's actually three privilege logs for the hospital. The first privilege log pertains to documents contained in the co-defendant meds file, and there's some overlap. The two letters that I just mentioned are not contained in the privilege logs for the credentials file and for the quality file, but the rest of the documents, 6th through 17th, are contained in the credentials file, and the three memorandums contained in the quality file. Just thought I'd ask a few questions on that. As far as the credentials file, the hospital produced all non-privileged documents, including Dr. Lawson's application for privileges and the privileges that were granted. I believe there was 170 pages that have been produced. The circuit court found that all credentials documents are not privileged, all of them, and this finding is clearly contrary to the plain language of the Medical Studies Act, which states in pertinent part that all information, recommendations, letters of reference, or other third-party confidential assessments of credentials committees and executive committees shall be privileged and only be used for granting, limiting, or revoking staff privileges. The documents claimed as privileged in the credentials file include confidential third-party assessments, which is clearly in the plain language of the Act. The circuit court also found that the documents were prepared prior to Ms. Tomlinson's emergency room visit on June 7, 2006. The date of Ms. Tomlinson's visit to the emergency room has no relevance to whether the credentials application for privileges was received by the hospital on December 4, 2001. All documents claimed to be privileged listed on the hospital's privilege log were initiated, created, prepared, or generated as part of the credentialing process, so after the credentialing process began. And as explained in the affidavit of the hospital's chief executive officer, Randy Simmons, the privileges are granted, it's a credentialing, re-credentialing process, so they're given privileges for two years and then they're re-credentialed and the process starts over, they're asked for information from doctors. How long were you given privileges? Two years? Yes. So it begins, they ask, you know, there's an application made and then they start gathering the information, that's part of the process, so and then they're granted privileges and then every two years they need to seek... So at your position, anything generated would be, would go towards the next re-credentialing process? Right. So none of it would be discoverable? Well, if it's it's asked for by the credentials committee, so we produce, the hospital produced like 170 documents, so there are... Out of the credentialing file? Correct, correct. What's, what was claimed as privileges are those letters of recommendation by the doctors, they're asked for as part of the initial credentialing and then the reappointment. Also, what's claimed privilege are documents from the National Practitioner Data Bank, they request those at the initial privileges granting and then the reappointment and those are actually privileged under the Healthcare Quality Improvement Act, which is the act that established the National Practitioner Data Bank and then there are also documents claimed to be privileged under the Healthcare Credentials Data Collection Act and those are the credentialing forms. There's certain information on those forms that the act has said are confidential, so we were either, if the whole form had that confidential information according to that act, we didn't produce that. If we could application did not fall under that credentialing act, didn't start till after, so that whole application was was produced. I'm going to now go on to the two letters that I referenced before, unless there's any other questions about credentials. The letters April 29, 2009 and October 15, 2008, these actually were letters inadvertently produced by MEDS, so they are in the police response. The April 29, 2009 letter, the court ordered that the name of another physician in that letter be redacted. So that was redacted as ordered by the court. This letter was based on a meeting of the Emergency Medical Services Committee at Harris Community Hospital and again there's an affidavit of the Chief Executive Officer, Randy Simmons, which establishes that. But that letter was a result of the meeting. The letter reflects the internal process and Dr. Lawson was not released. Could Dr. Lawson authorize you all to release the entire file? No. He could not? No. And it's actually a, it's a hospital's privilege, so we, and we only, the hospital only produced those non-privileged documents. We took a look at that and actually provided Dr. Lawson's counsel with a copy, a courtesy copy of what we were going to produce before we actually produced it. The October 15, 2008 letter, the court ordered production of only the second paragraph, but this paragraph discusses the protocols of the Emergency Medical Services Committee, which is the mechanisms of the peer review process. So that entire letter should be the two paragraphs that the judge found to be privileged. The quality file, the hospital also maintains, what it labels is the quality file and it's ongoing internal quality review of the Emergency Department by the Emergency Medical Services Committee, which hospitals do. They have internal quality control. The hospital stated in its reply that the file contains documents used by the credentialing process. So there's data actually from those quality reviews, but part of the credentialing process, and we just wanted to point that out for the court. They're noted on the privilege log as reappointment summary, but they're based on those internal quality reviews. If there are no other questions, we would urge the court to reverse the trial court's ruling as to the product production of the documents listed on the hospital's privilege log for credentials file for Dr. Lawson. Those letters dated full production of April 29, 2009 and October 15, 2008 find that the documents are privileged and affirm the court's finding that the documents listed on the privilege file for the quality file for Dr. Lawson are privileged and vacate the trial court's order finding the hospital to be in criminal contempt. Thank you, Mr. You'll have the opportunity for rebuttal. Mr. Stamliss. Thank you. We're here because we've been trying for a long time to get to the bottom of this case. The first thing I want to do is thank you very much for granting our motion to expedite this appeal based on the age of Mrs. Tomlinson. We really appreciate that. We're hoping to get back in the trial court and move this case along now that this is the second appeal in this case. The documents at issue here are very important because of the nature of the way that this hospital was staffed. The hospital's saying we're not responsible in this litigation for Dr. Lawson at all because he's not our doctor. He's not our employee. He's Med's employee. The discharge instructions specifically a record in this litigation say from the hospital to Mrs. Tomlinson say that Dr. Lawson is Med's employee. Med's in this litigation in turn denies that Dr. Lawson is their employee saying we're not responsible for him. He's an independent contractor. The allegations in the case against Med's are that they're responsible for Dr. Lawson's activities as the agent, employee, or parent agent of Dr. Lawson, but there's also a separate count against Med's for negligent hiring and supervision of Dr. Lawson because there was a complaint at C45, I believe, of the record. And in that contract between Med's and the hospital, Med's as of 2003 obligated itself contractually to do the credentialing on all of these doctors. Med's obligated itself to staff the hospital with the doctors that would do all the emergency care there as well as supervise and control these doctors. Med's not a party to this appeal. And Med's file, their credentialing file on Dr. Lawson is a part of this appeal as counsel just stated in that first log. So Med's has not taken exception with Judge O'Malley's order to produce those documents. In any event, the negligent hiring and supervision count against Med's goes to the very heart of this case. And the apparent agency claims against the hospital based on Dr. Lawson's actions and his credentials go to the very heart of this case. And why they're very important is because the parties have taken a position in this litigation and filed briefs and motions with the appellate court, Med's in particular, trying to dismiss the negligent supervision and hiring counts because they asserted that Dr. Lawson after all is a board certified doctor and has no gaps in his education. We quoted those parts in our brief, what their assertions were. Well, it turns out that that's not true at all. Under a few documents, we finally did get released. In 1984, at 14 years after graduating from college, Dr. Lawson graduated from medical school in Mexico. From 84 to 86, he was a resident at a hospital in Michigan, but he only completed two years of that three-year residency. He's never been board certified, in fact, in any discipline, let alone in emergency medicine, as their counsel wrote in their motion to dismiss the negligent supervision count. He was a flight surgeon for a number of years, over 15 years after finally completing medical school, relatedly after 14 years after college. So there was a big gap in his education, contrary to assertions made in the trial court. Dr. Lawson never had a residency or fellowship in emergency medicine and never was board certified in any field. So his credentials are very important here, most particularly because of the facts of the case. Winnie Tomlinson went into Paris Community Hospital on June 7, 2006, because she had vision problems. She had lost 20 pounds in the last couple of weeks, had sore jaw, she had bulging temples, she had double vision and triple vision, she had recent onset headache. These things were all documented in the records. And what did Dr. Lawson do? You'd think there would be certain things about that in his differential diagnosis. No, there was no differential diagnosis. He made one diagnosis that she had a urinary tract infection, though there were no complaints about urinary tract infection. So this doctor is at the center of the case, his credentials are at the center of the case, and they don't want to give us his credential documents. And they come up with this theory of this ongoing credentialing, even though that's not true according to their own documentation. According to their own documentation, this affidavit from Mr. Simons, which I moved to because it is not based on personal knowledge, and that's part of my briefs where I state that specifically, there's no dates in here. It doesn't say when he became a member of any of these committees. And in fact, we know he wasn't on these committees at any time before 2007 because he wasn't employed by the hospital before November 2007. Mr. John Faith was the CEO and president, same job that Mr. Simons now has. If you look at the affidavit carefully, the way it's worded and the way it's worded in terms of its dates and times and worded prospectively, he doesn't say he had any knowledge, even transitions between paragraph 8 and paragraph 9 to say, even though he says in paragraph 8, I have personal knowledge of this stuff, he goes in paragraph 9 and says, according to the file, the file reveals this. He didn't have personal knowledge of these matters. And he wasn't there at the time and couldn't have personal knowledge of these matters. There's a burden of proof here that the hospital has, and we do not have, to establish the applicability of these privileges of these privileges. And we believe they've woefully failed in their attempts to establish and bear their burden of proof in this regard. The only affidavit they ever submitted was the affidavit of Mr. Simons, which was never submitted to the trial court at any time. And I argued in the trial court that they failed to meet their burden of proof because they had no affidavits from anybody to support their bald assertions. We think the judge was spot on in ordering that these documents that predated the credentialing should not be produced. Putting aside the fact that they've now acknowledged, the hospital's now acknowledged that they inadvertently misfiled documents from the credentialing file into their quality file. So credentialing file documents are contained in the quality file log. Putting that aside for a moment, that's covered in the last couple of briefs in particular for your reference. There's various other documents that clearly have no reference to any committee whatsoever. They don't meet their burden of proof on these logs. But just a cursory review of the logs shows that they did not comply with the Supreme Court rules requirements of what is required in order to carry the debt. For example, they talk about quote, inter-office memos from who to who regarding what. They do that repeatedly. The letters, the two letters in question that they're talking about, to skip over to those, they are important letters too. And they don't say anything on their face anywhere about there being committee documents. Not in any way, shape, or form. In fact, the first letter dated April 29th, 2009, the letter that talks about the termination that MEDS made, MEDS, Unilateral Decision to Terminate Dr. Lawson. It says, thank you very much for the opportunity to meet. And this is a letter from the President of MEDS. Not a hospital letter, not a committee letter, to the President, Mr. Simons. And it says, thank you for the opportunity to meet with you and Robin Borden. There's no evidence of record of Robin Borden's participation on any committee. In fact, she's the head nurse at the hospital, responsible for the, we've deposed her, she's responsible for the nursing at the hospital. Nothing of record that Robin Borden sat on any committee at the time. And then the letter goes on to talk about how we're engaged by the hospital in which to provide you with the best MEDS has to offer. Well, they were offering this doctor and they were credentialing this doctor and they were making a business determination as a business entity, not as a quality control or credentialing entity, but Dr. Lawson should be fired. He should be let go. It says we are releasing him. We are releasing him. It doesn't say the committee made a determination. It doesn't say that MEDS is seeking information or input from you to go into the determination process. It says we're releasing him. Then it goes on to say in the next paragraph that it was a very pleasant evening meeting with you. So they had a pleasant evening meeting with Mr. Simons and Mr. Gordon. Nothing about our decision to fire Dr. Lawson. Hard to say that how it would be pleasant, would have been a pleasant meeting for those three to be sitting around having a credentialing or quality review committee meeting, if indeed it was. And their determination was to fire this long time small town emergency doctor who had been there at that point, at that point in 2009, ever since 2001, when the credentialing application process ended and he became, had hospital privileges. They're trying to say there was an ongoing credentialing program here. But even Mr. Simons' affidavit, which I think should be stricken and I think has major problems in terms of being admissible or usable, it says straightforward that they made a decision, 2001, to grant his applications. And so he was applied. It wasn't continuing. They had another process two years later. It wasn't continuing at all. He was, he applied, he was in for two years, and later he had to apply and he'd be in for two years. In any event, the hospital doesn't want to be admitted. The second part, this letter, by the way, that I'm referring to are in our appendix, at Plains Appendix at 24 and 25, the last two documents in our opening brief. The second letter talks about a bonus system that MEDS determined was necessary from a business perspective because Dr. Lawson, and this not to any credentialing committee, not even to the hospital, but to their MEDS employee or MEDS independent contractor, if that's what you believe. But it's MEDS writing to Dr. Lawson essentially saying, you're not doing your job and we want to incentivize you to be filling out the forms at the hospital and doing your documentation in the record, so we're going to give you $10 an hour bonus. Every time you do it right, if you do it at least right 90% of the time. Does that sound like credentialing? Does that sound like quality control? It sounds like a business decision. He wasn't doing his job right filling out the papers and they were going to make a business decision to incentivize him to do it right by offering him a bonus to do it right. Again, it certainly doesn't sound like credentialing whatsoever. Pre-existing documents or documents that are not privileged do not become privileged because they were submitted to a quality review committee or members of the quality review committee. It has to be committee work. That's Roche versus Springfield Hospital as we quoted and that's this honorable court in Maine versus Wood River Hospital cited at page 17 of our opening brief and cited in various other places in our brief. After doing that, we have to make sure that discussing Roche at length, this court stated that we hold the information generated prior to Dr. Maurice's application for privileges along with his application for privileges is outside the scope of the act and not privileged. This is true whether the committee reviewed these materials or not. Maine court also stated that there are other matters all too numerous to mention that are facts, facts that would exist independent of the peer review process and because they exist independent of the peer review process, they cannot be converted to privileged documentation even if they were handed to the committee. Webb versus Mount Sinai Hospital cited at page 19 of our brief is also very instructive on the documents that are contained in the meds privilege law and the documents and letters of correspondence that came from meds, not the hospital. As we cited there, Webb stated that the document created in the ordinary course of the hospital's medical business or for purposes of rendering legal opinions or to weigh potential liability or risk or for later corrective action by the hospital is not privileged. The court goes on to talk about how business decisions, decisions made by companies that are business decisions made in the ordinary course of business are not privileged. This is not even a hospital. That's not what meds is. There's no affidavit before this court from the hospital or for meds saying what Dr. Prusan and meds or anyone else did on any committee. We just have an affidavit from Mr. Simmons who wasn't even there at the time most of these documents started. And keep in mind, I have to correct a typo in my main brief and in our reply brief. I said that meds became responsible for the credentialing in 2005. That was in fact 2003 because the contract between meds and the hospital was entered into in 2003. And that specifically then obligated meds to do the credentialing and the staffing of the doctors at the Many of the documents in this case predate the time period of the event in question and many of them postdate this event. They're in the quality files and the credentialing file. We are at a very big disadvantage here because we don't get to see these documents. And because their laws for these documents are so woefully deficient, we really can't make a judgment as to what they say. There's very few dates on this, just like there's no dates in the Simon affidavits. They don't say when the credentialing started, when it ended, when the quality review started, if there were any, when they ended. No dates along those lines. It's just the bare bones of quality, I mean of laws, privilege laws that I've seen. And as we pointed out in our brief, the Pietro decision found that such bare bones recitations do not serve to have a hospital bear its burden of proof. You need more. You need more to the Supreme Court rules. You need more to put the other side on notice. So anyway, the point though is that I can't go document for document and toe for toe. I don't have that knowledge like the hospitals people do because they review those documents. And that unfortunately may fall upon this Court to review. But the judge, Judge O'Malley, already has done that. And there's no indication that he didn't know what he was doing. He looked at all these documents. One thing he did not do though, which I think I heard her say he did, was that he reviewed that the quality file should be not produced because of the Medical Studies Act. He didn't say that at all. Judge O'Malley ruled that the quality file shouldn't be produced because it violated, because producing so would violate the physician-patient privilege, a privilege the hospital has not asserted and no one has asserted in this case. So the judge did not assert the Medical Studies Act privilege even to the quality file in this case, even though the hospital asked him to do so. He referred our appendix to our first brief, plaintiff's appendix at page one. No, excuse me, that's the protective order, which is intended to protect other patients' confidentiality or other information that might be extraneous. But the order at plaintiff's appendix at three, which is the 21110 order, which is a detailed two-page order that goes on for ten paragraphs stating the plaintiff's law and giving the rationale that the judge had as to what documents were privileged and why they weren't. And then plaintiff's appendix at five is the judge's handwritten notation on the privilege order for Paris Hospital as to his ruling for every single document, evidencing that he went over all of these documents. And then plaintiff's appendix at nine goes over the judge's handwritten notations on another one of the privilege laws, the quality file for Dr. Lester. And that goes on for a number of pages until we get to the judge's February 26, 2010 order, which now is a three-page memorandum opinion that goes forth, cites cases, and carefully cites his decisions and why he made his decision. We pray for the relief you want. Judge O'Malley's decision should be upheld in part by this court, and we believe overruled as to those portions of the documents that he found should be held to be privileged. We don't believe the hospital has met its burden of proof, which they have. And we ask that this court indeed do its best under its heavy caseload to issue its decision in this manner as soon as possible consistent with this court's ruling to expedite that decision. Thank you so much. Thank you, Mr. Standa. Ms. Stewart, you have the opportunity for a summary vote. As far as the allegations of agency that Mr. Standa referenced, there's no relevance to those allegations to the documents contained in the credentials file or There are no documents that the hospital's claiming privilege that are pre-existing documents. They were all generated, prepared, initiated as part of the credentialing process when that process began. The hospital did produce 107 documents. It's clear through the documents, through what's been produced, and also the privileged documents, that there was a reappointment process. It's very clear privileges are given for two years, and then the reappointment process starts over. As far as Mr. Simmons' affidavit, it was attached to the hospital's motion to reconsider in the trial court, and to my knowledge, there was never a motion to strike that affidavit. Mr. Fite was the former CEO, and he has also been deposed in this case. Again, we just urge that the court, if there's no other questions, to find that the documents claimed as privileged are in fact privileged. Thank you. Thank you, gentlemen and ladies, for your briefs and arguments. We'll take the matter under invite.